The appellant, Bobby Seritt, was indicted on two counts of capital murder. Count one of the indictment charged Seritt with the intentional killing of Donald Williams when Seritt had previously been convicted of murder in the preceding 20 years, § 13A-5-40(a)(13), Code of Alabama 1975. Count two of the indictment charged Seritt with the intentional killing of Donald Williams during the course of first-degree burglary, §13A-5-40(a)(4), Code of Alabama 1975. The jury convicted Seritt of both counts of capital murder as charged in the indictment. Following the penalty phase of the trial, the jury, by a seven-to-five vote, recommended that Seritt be sentenced to life in prison without parole. The trial judge accepted the jury's recommendation and sentenced Seritt to life in prison without parole.
The evidence in this case tended to show the following: Donald Williams was staying in his mother's house so that the fire insurance could be continued on the house. Williams's mother, Nellie Phillips, had died about six months earlier, and Williams, as executor of her estate, was in the process of disposing of her property. Seritt had been a boarder of Mrs. Phillips. The two had had what was characterized at trial as a "friendly" relationship, and there was testimony that Seritt and Mrs. Phillips had talked of marriage, despite about a 30-year difference in their ages. Mrs. Phillips had purchased a truck for Seritt, and he was paying her back in installments. When Mrs. Phillips died, Seritt requested the title to the truck, but had not yet received it.
In the late night hours of April 28, or the early morning hours of April 29, Williams was stabbed repeatedly and was beat with a standing fan and a nightstick. A fingerprint found on a part of the fan matched Seritt's fingerprint. Williams's shotgun was found about one and one-half blocks from the boarding house where Seritt was staying. A pair of bloodstained Reebok brand tennis shoes was found in Seritt's room at the boarding house. After testing the stain, forensic scientists determined that the blood on the shoes was consistent with the victim's blood. A bloodstain found on the metal fan tube taken from the crime scene was also tested and was consistent with Seritt's blood. A filing cabinet in the room where Williams *Page 3 
was murdered had been rifled, and blood smears were found on dividers within the cabinet. More than $1,000 cash was found in the house.
 I
The appellant contends that because he was tried and convicted on two counts of capital murder arising out of the same incident, i.e., the killing of one person, his right to be protected against double jeopardy was violated. Seritt was indicted on two counts of capital murder. Count one of the indictment charged Seritt with the intentional killing of Donald Williams when Seritt had previously been convicted of murder in the preceding 20 years. Section 13A-5-40(a)(13), Code of Alabama 1975. Count two of the indictment charged Seritt with the intentional killing of Donald Williams during the course of first-degree burglary. Section 13A-5-40(a)(4), Code of Alabama 1975. Seritt was convicted of both counts of capital murder, but received one sentence of life without parole.
Murder when the appellant has previously been convicted of murder within the past 20 years, as charged in count one of the indictment, is not a lesser included offense of murder during a burglary, as charged in count two of the indictment, "because under the test established in Blockburger v. UnitedStates, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and recently reaffirmed by a plurality of the United States Supreme Court as the sole criterion for judging double jeopardy claims in United States v. Dixon, ___ U.S. ___, 113 S.Ct. 2849,125 L.Ed.2d 556 (1993), each offense required proof of a statutory element that the other did not." Powell v. State, 631 So.2d 289
(Ala.Crim.App. 1993), Jackson v. State, 516 So.2d 726, 763
(Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768
(Ala. 1986).
As this court reasoned in Powell, the appellant was charged with and was convicted of two counts of capital murder, both of which arose from the same act, the intentional killing of Williams. However, because each crime contains an element not contained in the other, there was no violation of the prohibition against double jeopardy. Blockburger v. UnitedStates, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932);Jackson v. State, 516 So.2d 726 (Ala.Crim.App. 1985). See also Ex parte Henderson, 583 So.2d 305 (Ala. 1991), ___ U.S. ___, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (murder during a robbery and murder done for pecuniary gain); Ex parte Haney,603 So.2d 412, 419 (Ala. 1992) (murder for hire and murder during a robbery), cert. denied, ___ U.S. ___, 113 S.Ct. 1297,122 L.Ed.2d 687 (1993); Merriweather v. State, 629 So.2d 77
(Ala.Cr.App. 1993) (murder during a burglary and murder during a robbery); Stewart v. State, [Ms. CR-90-415, October 23, 1992] 1992 WL 298129 (Ala.Cr.App. 1992) (on return to remand) (murder during a burglary and murder during a kidnapping), affirmed as to conviction, reversed as to sentence, [Ms. 1920509, September 3, 1993] 1993 WL 332698 (Ala. 1993), Powell v. State, supra.
In this case, the appellant was charged with murder made capital because he previously had been convicted of murder during the 20 years preceding the murder for which he is now charged, and murder during a first-degree burglary. While Williams's murder is a necessary element of both offenses, each offense also required proof of an element that the other did not. As in Powell, proof that Seritt had been convicted of murder in the 20 years preceding this murder did not require proof that the appellant entered or remained unlawfully in the house in which Williams was killed. Likewise, proving that Seritt committed burglary did not require proof that he had been convicted of a prior murder. The two counts of the indictment charged two separate offenses, and the State's evidence at trial established that the appellant committed two separate offenses. Therefore, the appellant's conviction for both offenses charged in the indictment did not violate the Double Jeopardy Clause.
 II
The appellant argues that results of DNA testing were improperly admitted into evidence because, he says, the results failed to meet the criteria set forth in Ex partePerry, 586 So.2d 242 (Ala. 1991). *Page 4 
In Ex parte Perry, 586 So.2d at 250, the Alabama Supreme Court set out the test for the admissibility of contested DNA evidence:
 "I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can give reliable results?
 "II. Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?
 "III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the actual performance or interpretation of the tests?"
In Perry, the Alabama Supreme Court found that as to DNA matching evidence, there is a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results. Thus, prong one of the Perry test has already been met.
The second question deals with whether the technology to provide reliable DNA test results is available. Phyllis Rollan of the Alabama Department of Forensic Sciences testified for the State regarding DNA evidence. At a hearing held in accordance with Frye v. United States, 293 F. 1013
(D.C. Cir. 1923), Ms. Rollan testified that the procedure she used in testing DNA in this case, the DQ Alpha testing procedure, was not the same used in Perry. However, Ms. Rollan testified as to the many uses of DQ Alpha testing, such as in HIV or AIDS testing, as well as where DQ Alpha testing is done, including research at universities. Therefore the procedure used in this case is generally accepted in the scientific community. She also said that the procedure was found to be reliable not only in the testing mentioned above, but also by the Office of Technology Assessment in a document prepared for Congress. Therefore, the trial court reasonably could have found from Ms. Rollan's testimony that the DNA testing techniques used in this case was generally accepted in the scientific community and found to be reliable, thus meeting the second prong of the Perry test.
As to the third prong of the Perry test, our inquiry is whether, in this case, the testing laboratory performed generally accepted scientific techniques without error in the performance or interpretation of the tests. Ms. Rollan testified extensively about the methods and techniques she followed in conducting the DNA DQ Alpha testing procedures in this case. She gave thorough testimony as to the controls used in the testing in this case, as well as to how the results of the tests were reached and how she reached her conclusions from those test results. Once again, Ms. Rollan's testimony regarding the checks and controls used in this case gave the trial court the basis on which to determine that in this particular case, the Department of Forensic Sciences performed generally accepted scientific techniques without error in the actual performance or interpretation of the DNA test, thus meeting the third prong of the Perry test. The trial judge did not err in allowing the jury to hear the contested DNA evidence.
The appellant also argued that the testimony as to population frequency statistics concerning DNA evidence was inadmissible because, he said, the State had not laid the proper predicate for admitting such evidence, and the prejudicial effect of the evidence outweighed its probative value. The test for admitting population frequency statistics is essentially the same test as set out above for admitting DNA matching evidence.
 "I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA population frequency statistics . . . can give reliable results?
 "II. Are there current techniques that are capable of producing reliable results in DNA population frequency statistics . . . and that are generally accepted in the scientific community?
 "III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the actual performance or interpretation of the tests?"
Ex parte Perry, 586 So.2d at 253.
Ms. Rollan's testimony regarding the population frequency statistics is similar to *Page 5 
the testimony concerning population frequency statistics that this court held adequately laid the predicate for the admission of such evidence in Yelder v. State, 630 So.2d 92
(Ala.Crim.App. 1991), rev'd on other grounds, 630 So.2d 107
(1992). Ms. Rollan stated that the Department of Forensic Sciences used the Hardy-Weinberg equilibrium method of determining population frequency, the same method that was approved in Yelder. Additionally, Ms. Rollan testified as to how the statistics in this case were derived, and how they applied in this case. The testimony laid a proper predicate for the admission of population frequency statistics evidence underPerry, and the testimony was properly admitted in this case.
Ms. Rollan's testimony was that the DNA results obtained in her tests showed that one in 29 whites would have the same DNA pattern as the appellant. She told the jury that the DNA pattern of blood found at the scene was consistent with that of a sample she had been given of the appellant's blood. At no time did she say that the blood found at the scene was definitely the appellant's blood. Her testimony in this regard was probative of whether the appellant could have been the killer, and indeed, it was a key piece of evidence, but it was not unduly prejudicial to the appellant. The probative value of the population frequency evidence outweighed the prejudicial effect of the evidence; thus the testimony was properly before the jury.
 III
The appellant also maintains that the trial court erred in failing to sustain his objection to a comment made by the prosecutor during closing arguments. In her closing argument, the appellant's attorney said:
 "And each one of you have to be convinced beyond that reasonable doubt that Mr. Seritt is the killer, that he just didn't have a fingerprint over there, that he just didn't have some blood on his shoes. You have got to be convinced that he is the one who used that fan and used that knife and whatever else there was."
During his final closing argument to the jury, the prosecutor replied to the appellant's counsel's argument as follows:
 "PROSECUTOR: You were asked whether or not a bloody fingerprint and shoes make this defendant a killer. And I submit to you that we already know he's a killer.
 "APPELLANT'S COUNSEL: Your Honor, I object to that, that is impermissible argument. A prior conviction is not to be used in the determination of guilt or innocence.
 "THE COURT: I didn't take it that he was talking about the prior conviction.
"PROSECUTOR: Now —
 "THE COURT: I do have a special statement about the priors, you have heard it before and I will be talking to you in just a minute about that."
The appellant contends that the prosecutor's comment that "we already know he's a killer," referred to his prior murder conviction, and was made to prejudice the jury against appellant. Moreover, the appellant argues, the remark conveyed the prosecutor's personal belief that the appellant was guilty. We disagree.
"Replies in kind are generally permissible. Allowing replies in kind rests within the sound discretion of the trial court, and wide latitude is usually given regarding replies in kind. [Citations omitted]." Blackmon v. State,574 So.2d 1037, 1040 (Ala.Crim.App. 1990) (quoting Davis v.State, 494 So.2d 851 (Ala.Crim.App. 1986)). From our review of the record, we find the remark was in response to the defense counsel's closing argument, and the trial court did not abuse its discretion in allowing the comment.
Even if the prosecutor's remark had been impermissible, we fail to see how it prejudiced the jury so as to require reversal. A prosecutor's remark requires reversal only "if the remark 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "Davis v. State, 494 So.2d 851, 852 (Ala.Crim.App. 1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643,94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). In this case, the jury already knew *Page 6 
that Seritt had previously been convicted of murder because that was an element that needed to be proved under count one of the indictment, which charged that Seritt had committed the murder with which he was presently charged while having been convicted for a previous murder within the past 20 years. Because the jury was already aware that Seritt had killed someone before, the prosecutor's remark that "we already know he's a killer" was a statement based on facts in evidence and did not so infect the trial with unfairness as to require reversal.
 IV
The appellant also argues that the search warrant for the appellant's room at the boarding house where he was then staying was based on a defective affidavit; therefore, he argues, the search warrant was defective. As a result, the appellant contends, the trial court should have granted his motion to suppress the bloodstained tennis shoes found in the appellant's room and they should have been excluded from evidence.
The basis for the appellant's argument that the affidavit was defective is testimony during a pretrial motion to dismiss by the detective who prepared the affidavit and executed the warrant. When the warrant was issued, the affidavit was the only information the judge had to determine whether there was probable cause to search Seritt's room; therefore, only the affidavit should be the considered when determining whether there was probable cause to issue the warrant. The detective's later testimony at the suppression hearing is irrelevant to our inquiry as to whether the judge had probable cause to issue the warrant.
The affidavit says, in pertinent part:
 "A support column to a floor model fan was recovered from the scene. It appears that this fan may have been used to strike the victim. Bloody fingerprints were visible on this support column.
 "Marion Owens, Fingerprint Technician, has analyzed the bloody fingerprints and has identified a 20-point match with the fingerprints of the suspect, Bobby Seritt. (Emphasis added.)
The affidavit went on to say that the detective believed the police would find bloody clothing in the appellant's room, and when the search warrant was executed, police seized a pair of blood-stained tennis shoes.
The appellant argues that the detective's assertion that "numerous bloody prints" identified as the defendant's were found at the scene was a false statement, then citesCalhoun v. State, 460 So.2d 268 (Ala.Crim.App. 1984), for the proposition that an affidavit based on a material false statement invalidates a search warrant.
The appellant's argument fails on two grounds. First, the detective's statement that "numerous bloody prints" identified as the defendant's were discovered at the scene was made at the suppression hearing. In reality, only one print matching that of the defendant was found. There is no mention of "numerous bloody prints" in the affidavit. In fact, while the affidavit does claim that fingerprints were visible, it goes on to state that one 20-point match with the suspect's fingerprints was made. There is no material false statement in the affidavit, which was the judge's basis for the decision to issue the warrant.
Additionally, as the State points out in its brief to this court, for a false statement to invalidate a warrant, it must have been made knowingly and intentionally or in reckless disregard to the truth. Calhoun v. State, 460 So.2d at 269. The defendant bears the burden of proving perjury or reckless disregard for the truth by a preponderance of the evidence.Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684,57 L.Ed.2d 667 (1978). The defendant failed to show that the affidavit's assertion that bloody fingerprints, rather than one bloody print, were found, was made intentionally or with reckless disregard for the truth. In fact, the affidavit correctly states that one match was made with the appellant's fingerprints. The trial court did not err in denying the appellant's motion to suppress the bloodstained tennis shoes.
 V
The appellant also contends that the trial court erred in allowing testimony of *Page 7 
irrelevant and prejudicial testimony regarding the appellant's character. Specifically, the appellant says, the prosecutor should not have been allowed to refer to the relationship between him and the victim's mother. The appellant is in his forties, and the appellant's mother was in her seventies when she died of natural causes about six months before the incident in question. Testimony concerning the relationship, which included the fact that the pair had talked of marriage, should not have been admitted, because, the appellant says, it was irrelevant and was an attempt to show the appellant's bad character.
At trial, however, the prosecutor said he was introducing the evidence to show what could have been a motive on the part of the appellant. From the record, one could draw a fair inference that the appellant killed Williams to get the title to the truck that Mrs. Phillips, Williams's mother, had purchased for him. Knowledge of the relationship between Seritt and Mrs. Phillips would explain why she had purchased a truck for one of her boarders. The Alabama Supreme Court has said that testimony offered to show motive is alwaysadmissible. Bowden v. State, 538 So.2d 1226, 1235 (Ala. 1988). The prosecutor elicited testimony concerning the relationship between the victim's mother and the appellant to give the jury a possible motive for the crime. Therefore, the trial court did not err in allowing testimony regarding the relationship, nor did it err in allowing the prosecutor to refer to the relationship.
The judgment in this cause is affirmed.
AFFIRMED.
All the Judges concur.