MOORE, Chief Justice
(dissenting).
I respectfully dissent. Fred Lee Bryant, the petitioner, was convicted of murder, see § 13A-6-2, Ala.Code 1975, and he was sentenced to life in prison as a habitual felony offender. The Court of Criminal Appeals affirmed Bryant’s conviction in an unpublished memorandum. Bryant v. State (No. CR-14-0601, September 11, 2015), — So.3d — (Ala.Crim.App.2015)(table). Bryant now petitions this Court for certiorari review. I would grant Bryant’s petition to review the record and to hear from the State of Alabama regarding the sufficiency of the evidence to sustain Bryant’s murder conviction.
The State presented evidence during Bryant’s trial demonstrating that Vincent Tillman was shot and killed on October 29, 2011, during an attempted armed robbery. Jermaine Mosley testified that, at. approximately 8:00 or 8:30 a.m. on October 29, 2011, he went to Tillman’s house to help Tillman repair a vehicle. A man unidentified by Mosley telephoned Tillman to arrange a meeting with Tillman in the parking lot of a grocery store on Dauphin Island Parkway. Mosley accompanied Tillman to the parking lot of the grocery store. Tillman used Mosley’s cellular phone to call the man he was supposed to meet. While Tillman was calling him, the man and a second man approached Tillman’s car, got into the backseat of Tillman’s car, and instructed Tillman to drive into the parking lot of an apartment complex “so the police wouldn’t pull [Tillman] over.”
Tillman drove into the parking lot of the apartment complex. Mosley testified that *12 he then 'turned around and noticed that one of the men in the backseat was pointing a gun at Tillman and demanding that Tillman “give him everything he had.” Tillman refused. According to Mosleyj Tillman grabbed the man’s gun and began struggling with him. The second man, who was unarmed,- fled from the car. Mosley ran after the second man but was unable to catch him. He testified that when he returned to the car Tillman was still in the car struggling with the man with the gun and that Mosley secured the man in a headlock. Shots were fired, so Mosley released the man from the headlock. The knit cap the .man was wearing fell to the ground. Mosley heard “a couple more shots” and climbed into , the backseat of the car. The man fired another shot. Mosley claims that the man then ran to the side of the apartment complex in the direction the second man had fled. Mosley testified that Tillman was “laid out.” “So,” Mosley said, “I got him. I seen he had his mouth open, eyes open. He was trying to talk. When he said, some blood came out of his mouth, I got my phone. I dialed 911.” At trial, Mosley testified that Tillman died in the car. Mosley identified the knit cap that belonged to the shooter; howevér, Mosley did not identify the shooter. •
Floyd Edwards, a truck driver for Hoffman Furniture, testified that he was delivering furniture on the morning of the shooting near where the shooting occurred. He stated that, between 10:00 and 10:30 a.m., he saw two black males, one short and one tall, run past his parked truck and the tall man was carrying a revolver. Edwards claimed that the two men got into a car that was parked next to Edwards’s truck. The driver of the car was a young woman. The car, said Edwards, “just took off” after the two black males got inside. Edwards could not identify the man who was carrying the revolver.
On October 29, 2011, Cpl. Russell Bene-field, a crime-scene investigator with the Mobile Police Department, recovered a bullet and a knit cap from the scene of the shooting. Cpl. Benefield delivered the bullet and knit cap to Officer Charles Miller, a crime-scene investigator with the Mobile Police Department, who, in turn, delivered the bullet and knit cap to the Alabama Department of Forensic Sciences. Officer Miller also collected a cheek swab from Bryant to obtain a DNA sample. Detective Kent Quinnie of the Mobile Police Department accompanied Officer Miller to perform the cheek swab on Bryant. He testified that Bryant is 6'1" tall.
Officer Anthony Sanchez of the Mobile Police Department testified that he worked as a probation officer at the Mobile County Community Corrections Center. He said that, on November 9, 2011, he transported Bryant from police headquarters to the Mobile Metro Jail so detectives there could collect a DNA sample from Bryant. Officer Sanchez testified that, during the trip, Bryant asked Officer Sanchez why detectives wanted to collect a DNA sample. Sanchez allegedly responded by tapping his head as if to say “think about it.” Sanchez testified that Bryant reacted to the gesture by stating: “Oh, my hat.”
On July 30, 2012, Ashley Lee, a nurse at University of South Alabama Medical Center, collected a blood sample from Bryant. Lee testified that Bryant resisted having his blood drawn and that police obtained the sample by court order. Donna Weaver Gibbons, who examines biological fluids and compares DNA profiles for the Alabama Department of Forensic Sciences, testified that she received a bloodstain card with blood taken from Tillman during his autopsy and that she received Bryant’s cheek swab, which contained Bryant’s *13 DNA sample. She also received tubes containing Bryant’s blood samples, as well as the knit cap recovered from the crime scene. According to the Court of Criminal Appeals, “Gibbons testified that the DNA found on the knit cap did not match the DNA from Tillman’s bloodstain card.” Moreover, the Court of Criminal Appeals stated that the cheek swab collected from Bryant “contained DNA from at least two individuals”; therefore, according to the Court of Criminal Appeals, Gibbons stated that she could not compare the DNA from the cheek swab with the DNA found on the knit cap. Gibbons nevertheless testified that when the DNA collected from Bryant’s blood sample was compared to the DNA found on the knit cap, Bryant “was included as a potential contributor.” She also indicated that, although there were at least two people’s DNA on the knit cap, “[t]he probability of including a random individual as a potential contributor to the mixture on the blue knit hat [was] approximately one of 10.2 million Caucasian individuals and one of 4.8 million African American individuals.”
Dr. Eugene Hart, a medical examiner for the Alabama Department of Forensic Sciences, testified that he performed the autopsy on Tillman. He observed gunshot wounds to Tillman’s chest, back, right hip, and hand and concluded that those wounds caused Tillman’s death. Hart also recovered a bullet from Tillman’s upper right back. Stephanie Dees, a firearm and tool-mark examiner for the Alabama Department of Forensic Sciences, testified that she received two “fired metal jacket bullet[s]” from the Mobile Police Department, in addition to a “fired metal jacket from the autopsy of Vincent Tillman.” Dees stated that those items were “consistent with being fired from a .44 Magnum or .44 special caliber cartridge” and that a .44 Magnum was a revolver and possibly the type of gun from which the bullets had been fired.
Two crucial details bother me about these facts. First, Floyd Edwards, the truck driver who saw two black men running near the scene of the crime, the taller of whom allegedly was carrying a gun, did not identify Bryant as the man he saw running. The fact that Edwards identified the gun as a revolver is immaterial because there are no facts linking Bryant to a revolver, or, for that matter, to any gun. For instance, there is no evidence indicating that Bryant owned or borrowed a revolver or that a revolver was ever recovered in connection with Tillman’s murder. Moreover, the fact that Bryant is a tall black man may not be sufficient to connect him to the unidentified tall black man seen near the crime scene.
Second, Jermaine Mosley identified the knit cap as the cap dropped by the man who murdered Tillman but did not identify Bryant as the murderer. The fact that a knit cap was recovered at the crime scene does not by itself link Bryant to the crime if there is no evidence indicating that Bryant owned a knit cap or that he routinely wore a knit cap. The knit cap is, however, significant because the DNA taken from Bryant’s blood sample showed that Bryant was, in the words of Donna Weaver Gibbons, an employee of the Alabama Department of Forensic Sciences, “a potential contributor” to the DNA found on the knit cap. Yet Gibbons also testified that the DNA of at least two individuals was present on the knit cap.
Moreover, Gibbons presented “underlying statistical evidence” regarding DNA found on the knit cap that may have created “ ‘ “a real danger that the jury [used] the evidence as a measure of the probability of [Bryant’s] guilt or innocence.” ’ ” Ex parte Perry, 586 So.2d 242, 254 (Ala.1991)(quoting other cases and subse *14 quently distinguished on other grounds). In particular, Gibbons testified that
“[t]he probability of including a random individual as a potential contributor to the mixture on the blue knit hat is approximately one of 10.2 million Caucasian individuals and one of 4.8 million African American individuals.”
This Court explained in Perry:
“The legal reasons for distinguishing between the admissibility of DNA ‘matching’ evidence and the admissibility of DNA population frequency statistics involve the potential impact of the population frequence testimony on the jury: DNA ‘matching’ testimony may say that everyone’s DNA is unique, but the impact of that testimony is not as strong as quantitatively stating that 1 in 209,100,-000 people might have DNA similar to the DNA in the blood found at the scene of the killing.”
586 So.2d at 254.
I do not question the accuracy or value of Gibbons’s testimony about DNA probability; instead, I point out that in Perry and other similar cases this Coui't has expressed concerns about DNA-population-frequency evidence such as that presented by Gibbons. See also Ex parte Hutcherson, 677 So.2d 1205, 1209 (Ala.1996); Turner v. State, 746 So.2d 355, 362 (Ala.1998). The population-frequency evidence linked to the knit cap, combined with Bryant’s exclamation — “Oh, my hat” — to Officer Anthony Sanchez of the Mobile Police Department after Sanchez pointed to his own head when Bryant asked why his DNA was needed, appears to be convincing. However, Bryant’s exclamation can be easily misinterpreted. I am concerned that a rational finder of fact could not have, by fair inference, found Bryant guilty beyond a reasonable doubt. Ex parte Pilley, 789 So.2d 888, 894 (Ala.2000)(citing other cases).
Based solely on the materials before us and on Bryant’s allegations in his petition for a writ of certiorari, without having a record or the State’s briefing to consider, I cannot conclude that the evidence was legally sufficient for the trial court to submit the issue of Bryant’s guilt or innocence to the jury, even when I accord the State all legitimate inferences based on the evidence. Therefore, I would grant Bryant’s petition for a writ of certiorari to consider all available evidence to ensure that Bryant has received full and adequate appellate .review of his claims.