LONG, Presiding Judge.
The appellant, Lacedrick Lindsey, was indicted for 14 counts of capital murder arising out of the deaths of 5 victims: Joseph Henry, Diane Brooks, Jaquess Brooks, Joseph Brooks, and Jakela Brooks. Counts 1 through 5 of the indict *328 ment charged Lindsey with the murders of each victim during an arson or by means of explosives. See § 13A-5-40(a)(9), Ala. Code 1975. Count 6 of the indictment charged Lindsey with the murders of two or more persons by one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala.Code 1975. Counts 7 through 11 of the indictment charged Lindsey with the murders of each victim through the use of a deadly weapon “fired or otherwise” used from outside a dwelling. See § 13A-5-40(a)(16), Ala.Code 1975. Counts 12 through 14 of the indictment charged Lindsey with the murders of three of the victims who were less than 14 years of age. See § 13A-5-40(a)(15), Ala. Code 1975. The jury found Lindsey guilty of the lesser included offense of intentional murder on all 14 counts. See § 13A-6-2(a)(1), Ala.Code 1975. The trial court entered judgments on the verdicts and sentenced Lindsey to life in prison for each of the 14 counts, with the sentences on Counts 1 through 5 to run consecutively and the sentences on Counts 6 through 14 to run concurrently with each other and with those imposed on Counts 1 through 5.
I.
Lindsey contends that the State’s evidence was insufficient to sustain his convictions for the intentional murders of the five victims.
The State’s evidence tended to show the following. In the morning hours of July 20,1997, Joseph Henry, Diane Brooks, and Brooks’s three children, 6-year-old Ja-quess, 5-year-old Joseph, and 6-month-old Jakela, perished in a house fire at their residence in Prichard. The call reporting the fire was received by the fire department at around 3:45 a.m. Firefighters responding to the call found the house engulfed in flames. Autopsies of the victims revealed that they died of smoke inhalation and thermal injuries. Investigators with the Federal Bureau of Alcohol, Tobacco, and Firearms determined that the fire had been deliberately set by ignition of a flammable liquid introduced into the residence through the front door. Firefighters discovered a plastic milk jug, containing gasoline and with a wick, in the front yard of the residence.
Testimony at trial indicated that Dewayne Jackson had been romantically involved with Diane Brooks — Joseph Henry’s common-law wife — and that Jackson was rumored to have fathered Brooks’s youngest child. As a result, there was an ongoing feud between Brooks and Jackson’s girlfriend, LaTasha Jordan. The women had filed complaints against each other with municipal authorities. There was testimony that on July 12, 1997, approximately a week before the fire, LaTa-sha Jordan, Dewayne Jackson, and members of their family, armed with guns and baseball bats, went to Joseph Henry and Diane Brooks’s residence. There, Jackson and Brooks exchanged hostile words, which led to a fistfight between Jackson and Henry. Testimony indicated that Henry got the better of Jackson in the fight. According to witnesses, after the fight was over, an angry Jackson shouted at Henry that he would kill him while he was sleeping.
Catina Sanders testified that on the day before the fire, she overheard a conversation in her living room between her then-boyfriend, Waverly Lindsey, and his brother, Lacedrick Lindsey. Also present, Sanders said, was Orenthal Mitchell. According to Sanders, Waverly Lindsey and Lacedrick Lindsey were talking about meeting with Dewayne Jackson in order to “smoke” someone named “Scooby” (Scooby was Joseph Henry’s nickname). (R. 192, 200.) Sanders testified that she understood the men to mean that they were *329 going to shoot or burn somebody when they used the term “smoke.” Sanders said she also overheard the men talking about getting paid by Dewayne Jackson; however, she said she did not know for what or how much. Sanders also heard the men talking about the fact that “Seooby” had beaten Jackson in a fistfight.
Later that same afternoon, Lacedrick Lindsey and Orenthal Mitchell asked Sanders to drop them off somewhere as she drove to the grocery store. Sanders testified that as she was giving them a ride, the two men put on masks made from pieces of cut black cloth. Because she did not want to be stopped by the police, Sanders asked the two men to get out of her car.
Shortly after Sanders returned home from the grocery store, Lacedrick Lindsey and Orenthal Mitchell arrived back at her house. Sanders cooked dinner, and after dinner, Waverly Lindsey, Lacedrick Lindsey, and Mitchell went out. The three men returned to Sanders’s house later that evening, and everyone, including Sanders, snorted cocaine. Sanders testified that at about 10:00 p.m. that evening, after they had exhausted their supply of cocaine, she and the three men went out looking for more cocaine; however, she said, they were unable to obtain more.
There was testimony presented that sometime after midnight, Sanders and the three men stopped their car at Johnny Bernoudy’s house. Lacedrick Lindsey went inside the house while the others remained in the car. Bernoudy, who was a friend of Lacedrick’s, testified that Lace-drick asked him for money, but that when he told him he had none, Lacedrick left. Bernoudy testified that it was about 2:45 a.m. when Lacedrick Lindsey came by his house. Sanders testified that when Lace-drick Lindsey returned to the car after talking to Bernoudy, he was carrying a sawed-off shotgun.
After leaving Bernoudy’s house, Sanders and the three men returned to her house. Sanders testified that before she went to bed that night, she saw Lacedrick Lindsey and Orenthal Mitchell leave her house. The two men were wearing dark clothing and black hooded sweatshirts, she said. Sanders testified that there was a light rain at the time. Later that night, a heavy rainstorm hit the area. When Sanders awoke the following morning, Waverly Lindsey, Lacedrick Lindsey, and Orenthal Mitchell were all asleep in her house. Sanders testified that wet clothing belonging to all three men was hanging on a bar by her back door. Although Sanders had not seen Waverly Lindsey leave with Lace-drick and Mitchell the previous night, the fact that Waverly’s clothing was also hanging up to dry led Sanders to conclude that Waverly, too, had gone out after she had fallen asleep.
Sanders testified that while she was cleaning up her yard after the storm, she found some torn black T-shirts that looked like they were made of the same material as the masks she had seen Lacedrick Lindsey and Orenthal Mitchell put on in her car. Sanders also noticed that the gas gauge in her car indicated that she had less gas in her car than had been in it when she went to bed. Sanders thought someone had siphoned gasoline from her car. After hearing about the house fire at Joseph Henry and Diane Brooks’s residence, and learning that the children were killed in the fire, Sanders notified the police and told them about finding the torn T-shirts in her yard and noticing that there was gas missing from her car. Sanders testified that about a week later, Lacedrick Lindsey left a message on her telephone answering machine, warning her that unless she told the police he had *330 nothing to do with the house fire, it was going to be “pretty fucked up” for her. (R. 234.)
Sandra Davis testified that she was La-cedrick Lindsey’s girlfriend in July 1997. Davis testified that sometime around 3:00 a.m. on the morning of July 20, 1997, Lacedrick Lindsey, Waverly Lindsey, and Dewayne Jackson came to her house and talked on her front porch for approximately half an hour. All three men were wearing black clothing, Davis said. Davis testified that she heard Lacedrick Lindsey telling the other men that “one was going to be at the back, one was going to be at the front, and one was going to be at the side.” (R. 379.) According to Davis, the three men left her house on foot at about 3:30 a.m. According to Davis, it was about a five-minute walk from her house to Joseph Henry and Diane Brooks’s residence. Davis stated that about 45 minutes later, Lacedrick Lindsey, Waverly Lindsey, and Dewayne Jackson returned to her house. Davis let the men in, and they sat on her couch and talked. Davis testified that she heard Lacedrick Lindsey say that he was at the back, that Waverly Lindsey was on the side, and that Jackson was at the front. She testified that Lacedrick Lindsey also said something about children, but that, at the time, she did not know what he was referring to. Listening to a news broadcast later that day, Davis learned that there had been a house fire that morning at Joseph Henry and Diane Brooks’s residence and that Henry and Brooks and the children had been killed in the fire. Davis telephoned the police and told them that Lacedrick Lindsey might be involved in the matter.
LaTasha Jordan testified that she had been Dewayne Jackson’s girlfriend at the time of the fire. Jordan testified that sometime during the early morning hours of July 20, 1997, Jackson came to her house, went straight to the bathroom, took a shower, and then went to sleep on her couch. Jordan was not sure of the exact time Jackson arrived at her house, but said that it could have been after 4:00 a.m. Jordan stated that her house was a block away from Joseph Henry and Diane Brooks’s residence.
Jordan testified that on the day before the fire at Henry and Brooks’s residence, she had thrown away an empty milk jug. When police officers searched her trash after the fire, she said, the milk jug was hot in the trash where she had put it. At trial, Jordan identified State’s Exhibit 34, the plastic milk jug that firefighters found in the front yard of the victims’ residence after the fire, as the same type of milk jug that was missing from her trash.
Catherine Coleman, a friend of Dewayne Jackson’s mother, testified that she saw Jackson on the evening of the fire. Coleman testified that Jackson asked her for a cigarette lighter, and she gave him hers.
Robert Buckhalter testified that he was an inmate in the Mobile County Detention Facility at the same time as Lacedrick Lindsey. Buckhalter testified that he overheard conversations between Lace-drick Lindsey and Waverly Lindsey in which Lacedrick Lindsey admitted that he set the fire in Prichard that killed a husband and wife and their children. Buck-halter testified that Lindsey said he had used gasoline to start the fire. According to Buckhalter, Lacedrick Lindsey stated that he wished he had not set the fire. Buckhalter testified that he also overheard Lacedrick Lindsey and Waverly Lindsey discussing plans to “get rid of’ Dewayne Jackson and a female witness. (R. 141-42.)
David Paxton, another inmate in the Mobile County Detention Facility, testified that he also overheard Lacedrick *331 Lindsey talking to Waverly Lindsey about having set the house fire. Paxton testified that Lacedrick Lindsey said he was worried about a “gas can” that police might find. Paxton testified that Lacedrick Lindsey also stated that he was worried that Dewayne Jackson might turn State’s evidence against him and that Jackson’s girlfriend, Sandra Davis, might agree to testify against him. Paxton testified that Lacedrick Lindsey stated that they should have killed Jackson when they had the chance. According to Paxton, Lacedrick Lindsey and Waverly Lindsey also discussed their attempts to convince Davis to leave town. Paxton testified that he overheard four or five conversations between Lacedrick Lindsey and Waverly Lindsey.
“In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust.”
Powe v. State, 597 So.2d 721, 724 (Ala.1991) (citations omitted).
Accepting as true all the evidence introduced by the State, according the State all legitimate inferences therefrom, and viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence to sustain Lindsey’s convictions for the intentional murders of the five victims. The State presented testimony that Lindsey admitted while in jail that he intentionally set the fire that killed the victims. There was evidence that Lindsey was aware that there were adults and small children at the residence when the fire was set. There was also testimony that just before and just after the fire, Lindsey was with Dewayne Jackson, who, the day before the fire, had threatened to kill Joseph Henry, one of the victims of the fire, while he slept. Lindsey was seen with Jackson shortly before the fire, talking about who would “be at the back,” who would “be at the side,” and who would “be at the front,” and again about 45 minutes later, when the men returned to Lindsey’s girlfriend’s residence. There was testimony that Lace-drick left Sandra Davis’s house, which was a five-minute walk from the victims’ residence, approximately 20 minutes before the fire was reported. Forty-five minutes later, when Lacedrick returned to Davis’s house, Davis overheard him making a comment about the children. There was evidence suggesting that Lindsey had a motive to act with Jackson to burn Joseph Henry and Diane Brooks’s residence because Lindsey needed money and Jackson was going to pay Lindsey to “smoke” Joseph Henry or to aid him in setting the fire. There was also testimony that after the fire, Lindsey either threatened or spoke of killing persons who could provide police with information or give testimony linking him to the fire. Based on these facts, we conclude that there was sufficient evidence from which the jury could have found that Lindsey either was directly responsible for the murders of the five victims or was an accomplice, and that he possessed the requisite intent to kill. Thus, the State’s evidence was sufficient to sustain Lindsey’s convictions for the intentional murders of the five victims.
II.
As noted above, Lindsey was indicted for 14 counts of capital murder arising out of the deaths of 5 victims, and the *332 jury found Lindsey guilty of the lesser included offense of intentional murder on all 14 counts of the indictment. The trial court sentenced Lindsey to life in prison for each of the 14 counts. Lindsey’s conviction on 14 counts of intentional murder, where there were 5 victims, violated the protection against double jeopardy. See, e.g., Rolling v. State, 673 So.2d 812, 814 (Ala.Cr.App.1995); and Meyer v. State, 575 So.2d 1212, 1217 (Ala.Cr.App.1990). The trial court’s actions would have been correct if Lindsey had been convicted of capital murder on all 14 counts of the indictment; there were 5 victims, and differing methods of making murder capital were alleged in the indictment. See Seritt v. State, 647 So.2d 1, 3 (Ala.Cr.App.1994). However, because Lindsey was found guilty of the lesser included offense of the intentional murder of the 5 victims, there could properly be only 5 convictions and 5 sentences, not 14.
Accordingly, this cause is due to be remanded to the trial court with directions for that court to vacate Lindsey’s convictions and sentences imposed under Counts 6 through 14 of the indictment. However, the convictions and sentences imposed for Counts 1 through 5 of the indictment are hereby affirmed.
AFFIRMED AS TO THE CONVICTIONS AND SENTENCES IMPOSED FOR COUNTS 1 THROUGH 5 OF THE INDICTMENT; REMANDED WITH DIRECTIONS TO VACATE THE CONVICTIONS AND SENTENCES IMPOSED FOR COUNTS 6 THROUGH 14 OF THE INDICTMENT.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.