WISE, Presiding Judge.
The appellant, Randy Lamont Lewis, was convicted of three counts of capital murder for the killing of Taurus Frost in case number CC-06-3554. Count I charged Lewis with murder made capital because he committed it by or through the use of a deadly weapon fired or otherwise used within a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; Count III charged him with murder made capital because he committed it during a first-degree kidnapping or an attempt thereof of Vontricesa Davis, see § 13A-5-40(a)(l), Ala.Code 1975; and Count IV charged him with murder made capital because he committed it during the course of a first-degree robbery of Vontricesa Davis, see § 13A-5-40(a)(2), Ala.Code 1975.[1] After a sentencing hearing, by a vote of 10-2, the jury recommended that he be sentenced to death. The trial court accepted the jury’s recommendation and sentenced him to death. In case number CC-06-3555, Lewis was also convicted of one count of attempted murder, a violation of §§ 13A-4-2 and 13A-6-2(a)(l), Ala.Code 1975; one count of first-degree kidnapping for the kidnapping of Vontricesa Davis, a violation of § 13A-6^13(a), Ala. Code 1975; one count of first-degree kidnapping for the kidnapping of Timothy Barnette, a violation of § 13A-6^43(a), Ala.Code 1975; one count of first-degree kidnapping for the kidnapping of Corlaeja Davis, a violation of § 13A-6-43(a), Ala. Code 1975; and one count of first-degree robbery for the robbery of Vontricesa Davis, a violation of § 13A — 8—43(a)(1), Ala. Code 1975. The trial court sentenced him to serve consecutive terms of life in prison on the attempted murder, robbery, and kidnapping convictions. Lewis filed a motion for a new trial, which was denied by operation of law. See Rule 24.4, Ala. R.Crim. P. This appeal followed.
Lewis raises some arguments on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice Lewis may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all eases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
*810 “On the evening of March 27, 2006, around 5:00 p.m., Taurus Frost and his girlfriend Vontricesa Davis went to Chantacleer Day Care and picked up two toddlers. Vontricesa was driving her Chevy Impala, Taurus was sitting in the car’s front passenger seat. After the toddlers were picked up, they were seated in the back seat. One child was two year old Timothy Barnette, who was Vontricesa’s son. The other child was three year old Corlaeja Davis, who was the daughter of Corliss Davis, Vontrice-sa’s sister. Next, they went to Piggly Wiggly in north Birmingham to pay Vontricesa’s mom’s phone bill. After-wards, they went to L & N City, which is in the Birmingham Division of Jefferson County, so Taurus could talk to the defendant, Randy Lewis. As they drove up the street, Randy Lewis was walking towards their car. Vontricesa stopped the car. Randy Lewis walked up to it, opened the back door of the passenger side, placed a gun to the back of Taurus’ head, and shot Taurus point blank, killing him instantly. Taurus fell to his left onto the middle of the console and blood was everywhere. Vontricesa was hollering and the toddlers were crying and screaming. The defendant then got out of the car, and made Vontricesa get into the backseat of another four door car with two other guys in it. Vontricesa was seated in the back seat behind the driver. The defendant then got back into Vontricesa’s Chevy Impala, but this time he was seated on the driver’s side. Vontricesa tried to get out of the car she was in, but the defendant pulled up and said Tou better not get out.’ Then the front seat passenger side occupant of the car she was in threatened her, by saying, ‘if my face come up in something, I’m gonna do something to you.’ He got into the back seat with her holding a gun as the driver drove them down the street. She then jumped out of the car, near a busy intersection. The defendant who was driving behind the car she jumped out of, deliberately swerved towards her, ran over her, and then drove off at a high rate of speed, running a red light while doing so. Ms. Davis’ car was found the next day behind an abandoned house with the body of Taurus Frost still in the front seat slumped over the console. His pockets appeared to be pulled out a little bit. The two toddlers were found alive in the backseat with the victim’s blood on them. It is noted that the car was locked with the windows rolled up at the time it initially was discovered by the police. The toddlers were removed from the car, cleaned up a bit, given some food and water and then taken to safety by several Birmingham Police officers. Ms. Davis testified at trial, that after being run over she remembers blanking out. She further testified that she was in the hospital for about a month, which included being in ICU for over a week. She received multiple injuries which included bruises and a damaged lung. She also underwent several surgeries. While in the hospital, Detective Armstrong showed Ms. Davis a photographic line-up, consisting of 3 six packs. In the first set of six packs, Vontricesa identified Randy Lewis and said, ‘He is the one who shot Taurus Frost.’- Randy Lewis was arrested three days after Ms. Davis identified him.
“In case number CC-06-3554 the defendant was charged with four counts of Capital Murder which are as follows:
“Count 1) Capital Murder — Fired or otherwise used within or from a vehicle,
“Count 2) Capital Murder — Robbery 1° (Victim is Taurus Frost)
*811 “Count 3) Capital Murder — Kidnapping Io
“Count 4) Capital Murder — Robbery Io (Victim is Vontricesa Davis)
“He was convicted of only three counts of Capital Murder, being counts one, three and four, and acquitted on count two. The jury recommended Death for counts one, three and four. The vote was Ten (10) for Death and Two (2) for Life Without Parole.
“In case number CC-06-3555 the defendant was charged with three counts of Kidnapping 1°, one count of Robbery Io, and one count of Attempted Murder. He was convicted of all charges contained in the indictment in that case.
“Evidence elicited at the trial showed the following:
“Witness Barbara Frost is the mother of victim Taurus Frost, age twenty-two at the time of his death. Taurus Frost had one brother and one sister. Both were older than the victim. Barbara Frost identified States # 1 as the coroner’s I.D. facial photo of her son. Von-tricesa Davis was the girlfriend of victim Taurus Frost. Barbara Frost last saw her son alive about five days prior to his death. She did not see Taurus Frost at all the day he died. To her knowledge Taurus Frost had one cell phone and wore necklaces and rings. She never received these items after his death. Vontricesa Davis has two children. The youngest is the baby, Timothy Barnett who is two years old, and Devonte Hines, (Red Man) who is thirteen years old. On 6-4-06 Fox 6 News reporter Melissa Hasbury came over to the celebration of Taurus’s life and spoke to her and Vontricesa.
“Witness Corliss Davis is the sister of Vontricesa Davis. Corliss Davis has two children, Brenda Davis and Corlae-ja Davis who is 4 now but was 3 a year ago. Timothy Barnett and Corlaeja Davis went to the same daycare. On the day this incident occurred, Vontrice-sa picked the toddlers up from Chan-tacleer Day Care. Corliss Davis later received a call from her mom saying Vontricesa was hurt and Randy had the kids. That night she did not ■ know where the kids were. About 8:00 a.m. the next morning, she received a call from the police to pick up the toddlers. They were not ‘physically harmed. Corlaeja Davis was shaky, scared and had urinated on herself. She was crying and it took about fifteen minutes to calm her down. She knew Taurus Frost from the neighborhood, and he and her sister were dating. She doesn’t know a Randy Williams, and did not go to his mom’s house to confront her.
“Witness Marguerite Kemp is the grandmother of Taurus Frost. Marguerite Kemp saw her grandson the day he was killed between 2:00 and 2:30 p.m. Taurus said he had $2,500 and was going Easter shopping and then, to Florida. Taurus showed her some money but did not count it to her. He wore a gold chain. The money and the chain were not recovered. The next Monday, sometime that morning, her daughter called and said Taurus was dead.
“Witness Patty Chappie lives in Jefferson County and is familiar with the intersection where the incident occurred. On the day in question, she was coming from work around 5:00 to 5:30 p.m. on Vanderbilt Road heading north. She stopped at a red light in the far left lane and saw a light colored white car going down the street, it was normal daylight. She then saw a lady come flying out of that car from the backseat door on the driver’s side, and then that car took off. She also saw a dark colored car follow *812 ing the white car. When the lady came out of the car, a car hit her and she rolled across the median into this witness’s lane. People stopped to help her, but Patty Chappie drove off, and later .called the police when she heard two children were involved. Although the weather was clear, she did not see the faces of the drivers of the white or dark colored cars.
“Witness Rick Renninger was at the intersection of Tallapoosa Street and Vanderbilt Road. He was in the left thru lane, with a turning lane beside him. To his almost immediate left, he saw a metallic blue vehicle and saw a girl get out of the door behind the driver’s side. As she stepped up- and out into the median, he saw a car run over her. He noticed that the car that hit her, and sped away through the intersection, was a lighter colored, silver or gray Impala. He stopped and got out of his car. Several people got out of their cars to help the victim. A lady screamed at the victim to wake her up, and that lady kept talking to her. He did not notice any injuries on the victim. The paramedics thought the injured lady wasn’t going to make it. Rick Renninger stayed for 5 to 10 minutes. He left his name on a card for the police. Later, the police called him for a statement. Rick Renninger thinks the silver or white Impala with düal tail lights as shown in State’s exhibit # 6 is consistent with the car he saw, but the color was darker in the picture than what he recalls seeing at the scene. He stated that the second car could have been the one he saw that day.
“Witness Nathan Atkins works for Fab floors, doing hardwood floors.- On the day in .question, he worked for a plumbing company. That evening he was at the intersection of 79 and Vanderbilt Road. He witnessed a car jump the median, and saw a lady on the ground who had been hit by a car. He saw two cars; a white car go one way and a gray metallic car go in another direction. He and two co-workers went to help the injured lady. She was in shock, shaking, and had trouble breathing and talking. She was saying, ‘He’s in the car, where’s my babies, where’s my babies, my babies are in the car.’ He was on the scene around 15 minutes at the most and left when the paramedics got there. Later, the police found him and he gave them a statement. He remembers the car vaguely to be a 2000 Impala. The car he saw looks like State’s exhibits # 6 and 7. He did not get a tag number. He saw two women on the scene, one possibly a nurse who tried to help the victim. , The other woman was a black female around 30 to 40 years old. Both women tried to keep the victim conscious. Nathan Atkins saw the driver of the car who hit the victim from a distance. The driver’s windows were down, but he never got out of his car. He drove away at a high rate of speed after he hit the victim. He was a very dark skinned black male, around 5'8" to 6'1".
“Witness Terry Brown worked at Brookwood Hospital in March of 2006. She was at the intersection where this incident occurred, on the day and time in question. She was in the farthest to the right lane by the intersection. She saw a young lady lying in the street, with people around her. She asked the victim her name and if she was okay. The victim responded by saying ‘My kids’. When asked where they were, the victim responded by saying ‘Randy.’ The victim gave Terry Brown her mom’s phone number, and said her back hurt. When Terry Brown asked the victim who Randy was, she never l-esponded. The witness asked, ‘Who is Randy, is he *813 your husband or boyfriend?’ The victim nodded her head and said, T don’t know.’ During the conversation, the injured lady was going in and out of consciousness. This witness gave a taped statement to the police on 5-3-06.
“Officer Christopher E. Robinette works for the Birmingham Police Department, and for 7 years he has worked as an accident reconstructionist. He also works wreck calls and serious accident calls. He works around 60 accidents a month. On 3-27-06 he worked a wreck at this intersection on Vanderbilt Road. By the time he arrived on the scene, the victim had already been transported to the hospital. He found no physical evidence on the scene. Since this was an intentional act, no accident or wreck reports were done. He looked for skid marks, tire prints or any evidence of a wreck on the scene, but none were found. He went to the hospital to speak to the victim, but due to her injuries, she was unable to speak. He spoke to her family members and learned the two toddlers involved were Timothy Barnette and Corlaeja Davis. Officer Welch checked on the victim’s injuries, and was told they were life threatening.
“Witness Anthony L. Paulding lives at 1219 — 33rd Street. On the evening of 3-27-06 around 11 p.m. he was walking his dog and saw a car in Mr. Collins’ báckyard, which was unusual because no one lived there. The next morning when he went to walk his dog again, he saw that the car was still there, so he called the police. He identified State’s exhibit # 6 as the car in the back yard. He never saw the car drive up or what was in the car.
“Officer Derwin Tolbert is a Birmingham Police Department patrol officer in Bellview Heights. On 3-28-06, he answered a call from 1304 — 34th Street in Ensley. The complainant’s wife directed him to the scene where the car was located. He found a silver four door Chevrolet Impala in the back of the residence. First, he ran the tag which was registered under the name Von-tricesa Davis. He walked up to the car and noticed condensation on the windows. He tried to open the doors, but they were locked. Next, he tried to get the VIN number from the car and noticed a victim on the front seat passenger side of the car. He then knocked on the glass and noticed two toddlers in the back seat. He -got the dispatcher to notify fire and rescue for help. The female child unlocked the real' driver’s side door for him. Both children had blood stains on their clothes and both went with Officer Mary Smith to another house to be cleaned up,’ given food and water and checked for injuries. Officer Derwin Tolbert searched the exterior of the house where the ear was found for suspects. Officer Pat Johnson an evidence tech from the Birmingham Police Department arrived, and the scene was turned over to him. Later the abandoned car was towed by Birmingham Towing after the body was removed. Officer Tolbert testified that he ran the tag on the car, but it came back to a silver car, not the car it was on.
“The tag number he ran was IC-9437 which was the tag for a Ford Contour. The Chevrolet Impala in which the body was found was registered to Vontricesa Davis. Officer Pat Johnson did a pull in report and an inventory report on the car.
“Officer Pat Johnson has worked for the Birmingham Police Department for 10 years, and has been an evidence technician for 11 ½ to 12 years and has worked thousands of crime scenes. He *814 went to a scene at 1304 — 34th Street in Ensley. There he found a vehicle with a deceased male in it, whose pockets appeared to be pulled out a little bit. First, he took photographs, showing how the scene appeared when he arrived. While on the scene, he collected a Glock 9mm pistol which had 16 rounds in it, with one live round in the chamber. It was located between the two front car seats. He collected a small plastic bag with green plant material from the victim’s left side on the passenger’s front seat. He unloaded the gun and later placed it in an evidence locker. He later went to Birmingham Towing, collected a ball cap from the vehicle and took it to the coroner’s office, so the coroner could look at it. He then took the ball cap back from the coroner’s office and secured it in locker # 1. Later he went back to Birmingham Towing and collected a cell phone and charger from the vehicle. The next day, on the 29th, he went back to Birmingham Towing to process the interior of the vehicle for latent finger prints. No prints were found on the interior. However, three prints were found on the exterior of the rear window. Also, at that time, he collected from the car, a white leather purse, miscellaneous papers, a 9 mm live round, an ashtray, 1 scale, 1 pack of cigarettes, and a swab of transferred paint which was on the car. The purse contained a date planner and two Alabama driver’s licenses for Vontricesa Davis. The purse and contents had blood stains on them. All of these items were turned over to the property room. No trace evidence was collected from the car. He did search the trunk of the car and looked underneath the car for ripped clothing, blood, etc. but found nothing. He attempted to take photos of the car’s under carriage. Later, he went to the coroner’s office and collected a serology card with blood, hair and saliva samples. He never received an I.D. report from the I.D. bureau on the prints, which he took from the exterior of the car.
“Officer Christian Herrod has worked for Birmingham Police Department for 10 years. He arrested the defendant in this case. The defendant had a small child with him when arrested, which he handed over to the grandmother. Also, the defendant had a black hand gun in his left side pants pocket, which was loaded. The officer turned it into the property room. A photograph of that gun was marked as State’s # 30. The officer further testified that he did not know if that gun was ever checked to see if it had been recently fired.
“Dr. Greg Davis, has been a deputy coroner for 14 years since 1993. He is also a pathologist who examines the exterior and interior of bodies, to determine the cause and manner of death. He was recognized as an Expert in his field by the Court. Qn 3-28-06 he performed an autopsy on Taurus Frost. The victim had a gun shot wound to the back of his head. The bullet path was straight through the head. The wound was a contact wound that had a muzzle print above the top of it from the 10:00 o’clock to 12:00 noon area. There was soot on the edges of the wound at the 6:00, 2:00 and 10:00 o’clock areas. Most of the bullet went through part of the brain stem and exited the body from a little slit above the left nostril. However, there was a tiny fragment of the bullet still in the head at the time of the autopsy, which he retrieved. He did not examine the bullet fragment, other than looking at it. Soot was found on the fabric of the victim’s ball cap. He examined the contents of the victim’s pockets which contained candy, 1 dime, [five *815 pennies] and a couple of pills that smelled like antibiotics. No other money or jewelry was found on the victim. The coroner testified that the cause of death was the following: the victim died as a result of a gunshot wound to the head.
“Witness Vontricesa Davis knew Taurus Frost, who was her boyfriend for over a year. She was 36 years old when this incident occurred and currently has two children, Devonte Hines 14, and Timothy Barnette 3, neither of which were fathered by Taurus. In 2006, at the time this incident occurred, Timothy was 2 years old. At that time, she had worked at Piggly Wiggly in Woodlawn for 8 years. On the day Taurus was killed, she worked from 8:00 a.m. to 4:00 p.m. Taurus drove her to work in her Chevy Impala. She identified State’s # 6 and # 12 as being her car. She saw money on Taurus earlier that day when she went to work, but did not know how much he had. Taurus picked her up in her car after work between 4:00 and 4:30 p.m. Vontricesa’s sister, Corliss Davis has two children also. One child is Corlaeja Davis, who was 3 at that time, and went to the Chantaeleer Day Care with Vontricesa’s son Timothy. Vontricesa and Taurus picked both toddlers up at around 5:00 p.m. Afterwards, they went to Piggly Wiggly in North Birmingham to pay Vontricesa’s mom’s phone bill. Next, they went to L & N City, which is in the Birmingham Division of Jefferson County, so Taurus could talk to Randy Lewis. Vontricesa identified the defendant in court. Von-tricesa was driving, Taurus was sitting in the front passenger side seat of the car, and the toddlers sat in the back seat. As she drove up the street, Randy Lewis was walking up towards the car, so she stopped the car. Randy Lewis then walked up to the car, opened the back door on the passenger side, placed a gun to the back of Taurus’ head and shot Taurus Frost point blank, killing him instantly. Even though she saw a gun in the defendant’s hand, she could not identify the type of gun it was. After Taurus was shot, he fell to his left onto the middle of the console, and blood was everywhere. Vontricesa was hollering, and the toddlers were crying and screaming. The defendant then got out of the car, and made Vontricesa get out also and get into another 4 door car that had two other guys in it. Vontricesa was placed in the back seat of that car behind the driver. The defendant then got into her Chevy Impala on the driver’s side. The car she was in drove off first, with Randy Lewis following in her car at one point. Vontricesa had her car door open as if she were about to get out, when Randy pulled up and said, ‘You better not get out.’ The front seat passenger side occupant in her car threatened her and said, ‘If my face come up in something, I’m gonna do something to you.’ He spoke with Randy on the cell phone, then got into the back seat with Vontricesa and held a gun on her. She later jumped out of the car, near a busy intersection, while it was being driven down the street. After she jumped out of the car, Randy deliberately swerved towards her, ran over her with her car and sped off through the intersection at a high rate of speed, running a red light while doing so. She remembers blanking out. She also remembers a girl telling her she just got hit and run over by a car. She gave that girl her mom’s number. Vontricesa kept asking about her kids, and saying Randy had her kids. She remembers seeing people, an ambulance, and that she could not breathe. She passed out. She was in the hospital for one month, *816 and ICU for over a week. She had to have a tracheotomy, and had a damaged lung, bruises and other injuries. Additionally, she had to be hospitalized for two more surgeries on her throat.
“Vontricesa testified that Randy has a brother, whose name is Timothy, and that they both look alike, but she can tell them apart. She has seen Taurus with a gun, but she did not see him with a gun on .the day in question. Taurus sold marijuana, but she did not see him with marijuana on that day. Taurus never told her why he needed to talk to Randy. She gave a taped statement to a detective in this ease and said she knew Randy’s face, but not his last name. She also picked out Randy Lewis in a photo line-up she was shown by the detective. On 6-3-06, Taurus’ family had a celebration of his life, which was co'vered by Fox 6 News. She spoke with a news reporter, some man, who gave her a written list of questions to answer, but never met or spoke with a reporter by the name of Melissa Hasbury. She I.D.’d the defendant, Randy Lewis in court.
“Mitch Rector works for the Birmingham Police Department. He has worked as a forensic scientist and a firearm examiner since 1987. In May of 2006 he received bullets, bullet fragments and a firearm which were associated with this case. He compared the test bullets from the defendant’s gun with the bullet fragment received from the coroner’s office, which came from the victim’s body, and found that there were some similarities. He opined that the bullet that killed the victim could have come from the defendant’s gun, but he could not say with absolute certainty that the defendant’s gun was the murder weapon. Later he received a Glock pistol and a 9 mm cartridge and did comparisons on them as well.
“Detective Dena Armstrong has worked 14 years with the Birmingham Police Department and 4 years as a homicide detective. She investigated this incident on 3-27-06. Due to the severity of the victim’s injuries, the first time she was able to speak with Von-tricesa Davis was on 4-24-06, while she was still in the hospital in pretty bad shape with a trach tube in her throat. At that time, the detective showed her a 6 pack of photos, which is an array of 6 photographs. She showed Vontricesa 3 six packs. The first set included state’s # 44 which contains a photo of the defendant. The defendant had not been taken into custody at that time. Von-tricesa picked # 2 which was a photo of Randy Lewis. She said, ‘He is the one who shot Taurus Frost.’ She then signed and dated the photo sheet and put the time on it. The second 6 pack shown was States #45. No identification was made from this line up, even though there was a suspect contained therein, who was a Mr. Powell. She showed her a third 6 pack, and no identification was made, even though there was another suspect in this lineup, that she did not identify. That suspect was Randy’s brother, Ray. The defendant was arrested on 4-27-06, which was 3 days following the victim’s I.D. of him. The detective testified that all locations in question were located in the Birmingham Division of Jefferson County.
“Melissa Hasbury works for Fox 6 News, as a producer and fill in reporter. She was called as a witness for the defense. On 6-4-06, she and another person worked a story about the death, murder, and other charges associated with this case. She wrote down some questions for a photographer to ask Vontricesa Davis at the celebration of life party, held for Taurus, and then did *817 a T.Y. report from there. She did not personally go to that party due to a conflict, nor did she personally speak to Vontricesa Davis.
“Nancy Lewis was called as a witness for the defense. She is Randy Lewis’s Auntie. She testified that Randy has a brother named Ray, and that they are not twins. She further testified that Ray is the oldest, and Randy is the youngest. She testified that Randy is an inch or two taller than Ray. She I.D.’d a driver’s license photo of Ray Lewis which was later entered into evidence.”
(C.R. 33-41.)
I.
Lewis’s first argument is that Alabama’s method of execution is unconstitutional. However, he did not raise this claim in the trial court. Rather, he raises it for the first time on appeal. Therefore,'we review this argument for plain error. See Rule 45A, Ala. R.App. P.
In Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008), the Alabama Supreme Court addressed the United States Supreme Court’s decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), and “conclude[d] that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.” Therefore, we do not find that there was any error, plain or otherwise, in this regard.
II.
Lewis’s second argument is that indicting him for, convicting him of, and sentencing him for three counts of capital murder violated double jeopardy principles. He bases his contention on the fact that all three counts were predicated on the same act. However, Lewis did not raise this claim in the trial court. Rather, he raises it for the first time on appeal. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
We addressed a similar argument in Williams v. State, 710 So.2d 1276, 1320-21 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), as follows:
“The appellant contends that the indictments in cases CC-92-1552, charging the capital offenses of murder committed during the course of a robbery in the first degree, and CC-92-1553, charging the capital offense of murder of two or more persons by one act or pursuant to one scheme or course of conduct, were multiplicitous because, he says, they charged him, twice for the intentional murders of Freddie Barber and Linda Barber. He also argues that his convictions on these charges violated his constitutional right not to be placed in jeopardy twice for the same offense because they arose out of the same incident, i.e., the killing of Freddie Barber and Linda Barber.
“An indictment is multiplicitous if a single offense is alleged in more than one count, and the effect is to prejudice the jury by suggesting that more than one offense has been committed. 42 C.J.S.,- supra, § 160. In this case, the trial court, on-motion of the state, consolidated the four indictments, including the two indictments under discussion here, for trial. As we hold in part XXV, infra, this consolidation was proper. In arguing multiplicity, the appellant is asking that we treat his indictments as one because they were consolidated. If we so treat them, the question becomes whether the two capital murder charges charged a single offense. This, in turn, brings us to the double jeopardy question.
*818 “In regard to the double jeopardy argument, one indictment charged the appellant with the intentional killing of four persons — Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, a violation of § 13A-5-40(a)(10); and the other capital indictment charged him with the murder of Linda Barber and Freddie Barber during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2). Both indictments are based partly on the same act: the intentional killing of Linda and Freddie Barber. However, the test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); see also United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (a plurality of the United States Supreme Court reaffirmed the Blockburger test as the sole criterion for judging double jeopardy claims); Seritt v. State, 647 So.2d 1 (Ala.Cr.App.), cert. denied, 647 So.2d 1 (Ala.1994). In this case, each capital offense charged required proof of an element that the other did not. Proof of the murder-robbery charge required proof of a robbery in the first degree, which the multiple-murder charge did not require. Proof of the multiple murder charge required proof of more than one murder, which the capital murder offense of murder[-robbery] did not require. We therefore conclude • that under the Blockburger test, the appellant was properly indicted and convicted for two separate and distinct capital offenses ‘notwithstanding a substantial overlap in the proof offered to establish the crimes,’ Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App.1985), rem’d on other grounds, 516 So.2d 768 (Ala.1986). Therefore, the charges were not multi-plicitous and the appellant’s convictions for both offenses did not violate the Double Jeopardy Clause.”
See also Ex parte Peraita, 897 So.2d 1227 (Ala.2004).
Likewise, in this case, each offense required proof of an element the other did not require. Proof of the charge pursuant to § 13A-5-40(a)(l), Ala.Code 1975, required proof that Lewis committed the offense during the course of a first-degree kidnapping or an attempt thereof, which the charges pursuant to §§ 13A-5-40(a)(2) and 13A-5-40(a)(18), Ala.Code 1975, did not require. Proof of the charge pursuant to § 13A-5^0(a)(2), Ala.Code 1975, required proof that Lewis committed the offense during the course of a first-degree robbery, which the charges pursuant to §§ 13A-5-40(a)(l) and 13A-5-40(a)(18), Ala.Code 1975, did not require. Finally, proof of the charge pursuant to § 13A-5-40(a)(18), Ala.Code 1975, required proof that Lewis committed the murder by or through the use of a deadly weapon fired or otherwise used within or from a vehicle, which the charges pursuant to §§ 13A-5-40(a)(1) and 13A-5-40(a)(2), Ala.Code 1975, did not require. Therefore, even though the counts were based on the same act, under Blockburger, Lewis was properly indicted for, convicted of, and sentenced for three counts of capital murder. Accordingly, we do not find that there was any error, plain or otherwise, in regard to Lewis’s capital murder convictions.
However, our review of the record indicates that Lewis was convicted of the capital offense of kidnapping-murder based on the kidnapping of Vontricesa Davis and one count of first-degree kidnapping based on the kidnapping of Von-tricesa and that he was also convicted of *819 the capital offense of robbery-murder based on the kidnapping of Vontricesa and the first-degree robbery of Vontricesa. Although Lewis does not raise this issue on appeal, the State concedes that his convictions for both kidnapping-murder and first-degree kidnapping involving Vontrice-sa and robbery-murder and first-degree robbery involving Vontricesa violate double jeopardy principles. We addressed a similar situation in White v. State, 900 So.2d 1249, 1270 (Ala.Crim.App.2004), as follows:
“However, White is correct that his convictions and subsequent sentencing for the underlying counts of robbery and burglary cannot stand. Moreover, the State concedes that White’s convictions and sentences for robbery and burglary are due to be vacated. Section 13A-1-8(b)(1), Ala.Code 1975, establishes:
“ ‘When the same conduct of a defen- ■ dant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if ... [o]ne offense is included in the other, as defined in Section 13A-1-9 [the lesser-included offense statute]....’
As we stated in Adams v. State, 955 So.2d 1037, 1098-99 (Ala.Crim.App.2003):
“ ‘A defendant cannot be convicted of both a capital offense and a lesser offense that is included in the capital charge. See Mangione v. State, 740 So.2d 444 (Ala.Crim.App.1998); Borden v. State, 711 So.2d 498 (Ala.Crim.App.1997), aff'd, 711 So.2d 506 (Ala.1998). As this Court stated in Man-gione:
“ ‘ “While the appellant was properly charged with the two capital offenses, see Borden, 711 So.2d at 503-04, n. 3, and both offenses were properly submitted to the jury, the prohibition against double jeopardy was violated when the appellant was convicted of the capital offense of murder during the course of a kidnapping under Count I of the indictment and also was convicted of the lesser-included offense of intentional murder under Count II of the indictment, because the ‘same murder was an element of the capital offense and the intentional murder conviction.’ Borden, 711 So.2d at 503. See also Coral v. State, 628 So.2d 954, 958 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994) (holding that the defendant’s conviction of the lesser-included offense of intentional murder under a count alleging the capital offense of murder-robbery and his conviction of the capital offense of murder-burglary violated the principles of double jeopardy where the same murder was an element of both convictions).”
“ ‘740 So:2d at 449. Accordingly, this case must be remanded for the trial court to vacate the conviction for the robbery of Andrew Mills because that offense was included in the capital ■offense for which he was convicted.’
“Just as in Adams, White’s convictions and sentences for robbery in the first degree and burglary in the first degree must be vacated.”
Similarly, in this case, first-degree robbery was a lesser included offense of the capital offense of robbery-murder because both charges were based on the robbery of Vontricesa Davis. Also, the first-degree kidnapping charge involving Vontricesa was a lesser included offense of the capital offense of kidnapping-murder because *820 both charges were based on the kidnapping of Vontricesa. Therefore, Lewis’s convictions and sentences for first-degree robbery and first-degree kidnapping of Vontricesa violate double jeopardy principles and must be set aside.
III.
Lewis’s third argument is that the State did not present sufficient evidence to support his capital murder convictions. Specifically, he contends that
“[t]he State presented insufficient evidence to convict [him] of capital murder. The jury found [him] not guilty in Count Two, shooting in the course of committing a robbery and the verdict in Count One, Three and Four are inconsistent and contrary with the weight and sufficiency of the evidence presented to the jury for their consideration.”
(Lewis’s brief at p. 52.) Although he couches his claim in terms of the sufficiency of the evidence, he actually challenges the weight of the evidence.
“In Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App.1989), this court noted the difference in ‘sufficiency’ and ‘weight’ as follows:
“‘The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, “viewing the evidence in the light most favorable to the prosecution, [a] rational factfinder could have found the defendant guilty beyond a reasonable doubt.” Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2215, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App.1984).
[[Image here]]
“ ‘In contrast, “[t]he ‘weight of the evidence’ refers to ‘a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.’ ” Tibbs v. Florida, 457 U.S. at 37-38 [102 S.Ct. at 2216] (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala.1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala.1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). “‘[T]he credibility of witnesses and the weight or probative force of testimony is for the jux-y to judge and determine.’ ” Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App.1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)).[’]
“(Emphasis in original.) See Smith v. State, 604 So.2d 434 (Ala.Cr.App.1992); Pearson v. State, 601 So.2d 1119 (Ala.Cr.App.1992); Curry v. State, 601 So.2d 157 (Ala.Cr.App.1992).”
Zumbado v. State, 615 So.2d 1223, 1240-41 (Ala.Crim.App.1993). We will not invade the province of the jui'y and reweigh the evidence in this case. Therefore, Lewis’s argument is not well-taken.[2]
IV.
Lewis’s fourth ai-gument is that his trial attorneys rendered ineffective assistance. Specifically, he contends that it appears that his tidal attorneys did not properly investigate the statements of the witnesses; that, based on that failure, his *821 trial attorneys were not able to find the cameraman from WBRC-TV Fox 6 News who videotaped Vontricesa saying that she did not know the man who was charged with killing Taurus Frost until the end of the defense testimony; that he was not able to subpoena the cameraman to authenticate the videotape; and that he was not able to introduce the videotape for the purpose of impeaching Davis. However, Lewis did not raise his ineffective assistance of counsel claim in his motion for a new trial. Rather, he raises this claim for the first time on appeal. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
“The difficulty of reviewing claims of ineffective assistance of counsel on direct appeal, when those issues have not been developed on the record, was addressed by the United States Supreme Court in Massaro v. United States, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). The United States Supreme Court stated:
“ ‘When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming ineffective counsel must show that counsel’s actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel’s alternatives were even worse. See Guinan [v. United States, 6 F,3d 468 (7th Cir.1993)], at 473 (Easterbrook, J., concurring) (“No matter how odd or deficient trial counsel’s performance may seem, that lawyer may have had a reason for acting as he did.... Or it may turn out that counsel’s overall performance was sufficient despite a glaring omission ... ”). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are • not introduced. See, e.g., Billy-Eko [v. United States 8 F.3d 111 (2d Cir.1993)], at 114. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.’
“538 U.S. at 504-05, 123 S.Ct. 1690. The Massaro Court further stated:
“ ‘Even meritorious claims would fail when brought on direct appeal if the trial record were inadequate to support them. Appellate courts would waste time and resources attempting to address some claims that were meritless and other claims that, though colorable, would be handled more efficiently if addressed in the first instance by the district court on collateral review.’
“538 U.S. at 506-07, 123 S.Ct. 1690. See also United States v. Gordon, 346 F.3d 135, 137 (5th Cir.2003) (‘This is not the rare case in which a claim of ineffective *822 representation can be resolved on direct appeal. The record has not been developed with regard to counsel’s motivation for his trial tactics.’).
“In Ex parte Frazier, 758 So.2d 611 (Ala.1999), the Alabama Supreme Court noted that the Court of Criminal Appeals is obliged by Rule 45A, Ala. R.App. P., to review a claim of ineffective assistance of counsel on direct appeal in a death-penalty case:
“‘A defendant seeking a new trial based on a claim of ineffective assistance of counsel should raise this issue in a timely motion for a new trial. See Rule 24.1, Ala. R.Crim. P.; Ex parte Ingram, 675 So.2d 863 (Ala.1996). Ordinarily, a defendant’s failure to raise the claim in this manner will preclude review of this issue on direct appeal. See Ingram,, 675 So.2d at 865. However, in a death-penalty case, the Court of Criminal Appeals will review the defendant’s claim of ineffective assistance of counsel on direct appeal, under the plain-error rule, even if he did not preserve the issue in a timely motion for a new trial. See Rule 45A, Ala. R.App. P.’
“758 So.2d at 615-16 (footnote omitted). Therefore, we are limited to reviewing these ineffective-assistance-of-counsel claims for plain error. See Rule 45A, Ala. R.App. P.
“To prevail on a claim of ineffective assistance of counsel the petitioner must satisfy the test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show: (1) that counsel’s performance was deficient, and (2) that he was prejudiced as a result of the deficient performance.
“‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
“Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted). As the United States Supreme Court further stated:
“ ‘[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In *823 any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.’
“466 U.S. at 690-91,104 S.Ct. 2052.”
Robitaille v. State, 971 So.2d 43, 68-70 (Ala.Crim.App.2005).
During the trial, Vontricesa identified Lewis as the person who shot Taurus; who forced her, at gunpoint, to get out of her vehicle and to get into a vehicle with two other men; who drove off in her vehicle while her son and niece were in the back seat; and who ran over her when she jumped out of the other vehicle. The State also presented evidence that Von-tricesa had picked Lewis out of a photographic lineup and identified him as the person who shot Taurus. During cross-examination, the defense questioned Von-tricesa about a celebration of life party that was held in honor of Taurus on June 3, 2006. Vontricesa testified that there was one reporter present, but it was not Melissa Hasbury; that the reporter was a man; that she did not talk to Hasbury at all; and that she did not tell Hasbury that she did not know who ran over her and who had killed Taurus. Subsequently, the defense called Hasbury as a witness. Hasbury testified that she did cover the story regarding the celebration of life party; that she did not personally attend the party; that she did not personally talk to Vontricesa; and that she wrote down some questions for the photographer, and he went out to the party and talked to Vontricesa. At that point, the defense indicated that it did not have any further questions for Vontricesa. During the subsequent lunch break, the following occurred:
“[DEFENSE COUNSEL]: ... I would also like to put on the record that I interviewed Miss Hasbury as late as Friday, and she told me she had personally interviewed this woman and that the woman had denied knowing who her killer was; who the killer of Frost was, that I have talked, to her lawyer three or four different times, and the story has always been the same until she got on the witness stand a few moments ago.
“THE COURT: And put under oath.
“[DEFENSE COUNSEL]: And was put under oath, and then she said that she had sent a photographer out there. And they never bothered to'tell me who the photographer was or [if] the photographer asked the questions. It was- always her asking the questions.
“THE COURT: Well, that was consistent with what the victim testified to.
“[DEFENSE COUNSEL]: Yes, it was. She said she talked to the photographer, but not to the news lady.
“THE COURT: Right.
“[DEFENSE COUNSEL]: And I — at this time, because this is a capital murder case, I would like to ask for time to see if I can locate that photographer and get him up here.
“THE COURT: Well, we are going to have a lunch break. We are going to have a lunch break.”
(R. 431-32.) After the lunch break, the following occurred:
“[DEFENSE COUNSEL]: We had— I had contacted — we had subpoenaed film footage, news footage, from WBRC TV Fox News, Fox 6 News, about their coverage of this murder, and they had done a fairly in-depth news coverage of a party that was given in celebration of the life of Taurus Frost, on June 4th, 2006. As a part of the newscast, Melissa Gilbert (sic) — I mean Melissa Has-bury, who is a news woman with them, had come on, and it appears on the tape *824 coverage that she is interviewing several people at the party, one of whom was Miss Vontricesa Davis.
“THE COURT: But that was television illusion.
“[DEFENSE COUNSEL]: ' Yes. At the end of the interview, at the end of everything, she says, T did an in-depth interview of — an exclusive interview with Vontricesa Davis, and she tells me that she does not know the man'who has been charged with this murder.’ When I asked Ms. Davis — -so, I subpoenaed Miss Hasbury and talked to her and her Lawyer, Gilbert Johnson, on the phone Friday, and Mr. Johnson agrees with me that he came away from that conversation believing that she had personally interviewed Ms. Davis.
“THE COURT: Came away from what conversation?
“[DEFENSE COUNSEL]: The conversation that Mr. Gilbert Johnson and Melissa Hasbury and I had Friday.
“THE COURT: Oh, okay.
“[DEFENSE COUNSEL]: Wherein Ms. Hasbux-y said she had conducted a personal interview with Ms. Davis and Ms. Davis told her she did not know the man who was charged with killing Taurus Frost.
“THE COURT: Of course, she wasn’t under oath at that time, was she?
“[DEFENSE COUNSEL]: So I had . arranged for her to be here today, and of course when she took the witness stand she said she did not interview Vontricesa Davis, did not go to the party; she had sent a cameraman.
“THE COURT: All right. She was not under oath during the conversation Friday?
“[DEFENSE COUNSEL]: No she was not under oath.
“THE COURT: Okay.
“[DEFENSE COUNSEL]: As anybody who could see me at the time she testified could tell I was absolutely shocked that she said she wasn’t there. So, later, over the lunch break, I — well, as soon as I walked out the door for the lunch break, I checked my phone, which had been on silent, and I had a message from her Lawyer, Gilbert Johnson. He said, T’m very sorry. I was privy to that conversation Friday, and I’m just as shocked as you are.’ He said, T absolutely expected her to get up there and testify to what she told us,’ but he said, ‘evidently you and I misunderstood.’ And I said, ‘Well, something happened.’ But he got ahold of the cameraman who had done the interview, and that man’s name is James Johnston. He was working there then and he works there now. And we have, in the last fifteen or twenty minutes, been out in one of the meeting rooms, looking at that film coverage on my computer.
“THE COURT: With that photographer?
“[DEFENSE COUNSEL]: Yes, with the photographer. And the photographer says she would never have said that, had I not given her that information, but I do not remember talking to that woman about this.
“THE COURT: Talking about Melissa?
“[DEFENSE COUNSEL]: He said ‘Melissa Gilbert (sic) would not have put that information on the air had I not provided her with the information about the interview.’
“THE COURT: Right.
“[DEFENSE COUNSEL]: But he said, T don’t remember asking Ms. Von-tricesa Davis about the murder.’ He said, T remember that she talked to me and I had it on tape, but I don’t remember talking to her about the murder.’ *825 But he said, T know that Melissa Gilbert (sic) — Melissa Hasbury would not have put that on the air, had I not given her that information, but I can’t get on the witness stand to testify to that.’ I said, ‘Mr. Johnston, I wouldn’t ask you to. I will just have to go in there and put on the record what we tried to do and we will just have to go forward.’ And I don’t know anything else to do, Judge.”
(R. 434-37.)
The record before this court does not support Lewis’s assertion that his attorneys did not properly investigate the statements of the witnesses. Rather, it appears that the defense interviewed Has-bury with her counsel present and that, based on that interview, both the defense and Hasbury’s counsel believed that Has-bury had personally interviewed Vontriee-sa. Further, the record does not support Lewis’s assertion that the fact that he did not discover the existence of the cameraman until the end of his testimony “result[ed] in the failure of the cameraman being subpoenaed to authenticate the tape for the purpose of the impeachment of’ Vontricesa. (Lewis’s brief at p. 53.) Rather, it indicates that defense counsel did not call the cameraman as a witness because the cameraman told him that he did not recall talking to Vontricesa about the murder and that he knew “‘Melissa Hasbury would not have put that on the air, had [he] not given her that information, but [he could not] get on the witness stand to testify to that.’ ” (R. 437.) Therefore, the record does not affirmatively show that his trial attorneys’ performance was deficient and that he was prejudiced by their allegedly deficient performance. Accordingly, we do not find that there was any plain error in this regard.
V.
Finally, pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Lewis’s convictions and sentence of death.[3] Lewis was indicted for and convicted of capital murder because he committed the murder during the course of a first-degree kidnapping, because he committed the murder during the course of a first-degree robbery, and because he committed the murder by or through the use of a deadly weapon fired or otherwise used within or from a vehicle. See § 13A-5-40(a)(l), (2), and (18), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved two aggravating circumstances — 1) Lewis knowingly created a great risk of deathi to many persons, see § 13A-5-49(3), Ala.Code 1975; and 2) Lewis committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery and kidnapping, see § 13A-5-49(4), Ala.Code 1975. The trial court found that two statutory mitigating circumstances existed — 1) Lewis did not have a significant history of prior criminal activity, see *826 § 13A-5-5K1), Ala.Code 1975; and 2) Lewis was 19 years old at the time of the offenses, see § 13A-5-51(7), Ala.Code 1975. It also made the following findings as to nonstatutory mitigating circumstances:
“(1) The defendant was raised in an abusive home and was abused by his step-father. His mother did nothing to stop the abuse.
“(2) The defendant lived in several different foster homes and attended several different schools and did well in school.
“(3) The defendant is socially immature for his age.
“(4) The defendant was a good child and is loved by his family. He took his cousin’s children to the mall and took care of them.
“(5) The defendant’s cousin loves him and does not want him to die.
“(6) The defendant has a total I.Q. of 84 and is not mentally retarded.
“(7) The defendant did not ‘physically’ harm the two toddlers he locked in a car with a dead body, with the windows rolled up.
“(8) The defendant was a father to his girlfriend’s children, and his family did not want him to die.[4]
“(9) Any other mitigating circumstances offered pursuant to this code section.”
(C.R. 47-48.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced Lewis to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether the sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Lewis committed the murder during the course of a kidnapping, during the course of a robbery, and by or through the use of a deadly weapon fired or otherwise used within a motor vehicle. Similar crimes are being punished by death throughout this state. See Sale v. State, 8 So.3d 330 (Ala.Crim.App.2008); Gissendanner v. State, 949 So.2d 956 (Ala.Crim.App.2006); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003); Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected Lewis’s substantial rights. Other than the double jeopardy violation set forth in Part II of this opinion, we have not found any. See Rule 45A, Ala. R.App. P.
For the above-stated reasons, we affirm Lewis’s convictions and sentences for capital murder during the course of a first-degree kidnapping, capital murder during *827 the course of a first-degree robbery, capital murder committed by or through the use of a deadly weapon that was fired or otherwise used within a vehicle, attempted murder, first-degree kidnapping with regard to Timothy Barnett, and first-degree kidnapping with regard to Corlaeja Davis. However, for the reasons set forth in Part II of this opinion, Lewis’s convictions and sentences for first-degree robbery and for the first-degree kidnapping of Vontricesa Davis cannot stand. Therefore, we remand this case to the trial court with instructions that that court vacate Lewis’s convictions and sentences for first-degree robbery and first-degree kidnapping of Vontricesa Davis. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 35 days after the release of this opinion.
AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.
WELCH, WINDOM, and MAIN, JJ., concur.
KELLUM, J., concurs in the result.

On Return to Remand

WISE, Presiding Judge.
In an opinion that was released on October 2, 2009, we affirmed Lewis’s convictions and sentences for capital murder during the course of a first-degree kidnapping, capital murder during the course of a first-degree robbery, capital murder committed by or through the use of a deadly weapon that was feed or otherwise used within a vehicle, attempted murder, first-degree kidnapping with regard to Timothy Barnette, and first-degree kidnapping with regard to Corlaeja Davis. However, we found that Lewis’s convictions and sentences for first-degree robbery and first-degree kidnapping of Vontricesa Davis violated double jeopardy principles and remanded this case to the trial court with instructions that it vacate Lewis’s convictions and sentences for first-degree robbery and first-degree kidnapping of Von-tricesa Davis.
On remand, the trial court vacated Lewis’s convictions and sentences for first-degree robbery and first-degree kidnapping of Vontricesa Davis. The trial court complied with this court’s remand instructions. Accordingly, we affirm the trial court’s judgment.
AFFIRMED.
WELCH, WINDOM, and MAIN, JJ., concur.
KELLUM, J., concurs in the result.

. Count II charged Lewis with murder made capital because he committed it during a robbery of Taurus Frost. However, the jury'acquitted him of that count of capital murder.

. To the extent Lewis actually challenges the sufficiency of the evidence to support his convictions, we have reviewed the evidence, and we find that it is sufficient to support his convictions.

. Because we are setting aside convictions for lesser included offenses rather than capital murder convictions, we need not remand for the trial court to reweigh the aggravating and mitigating circumstances. See Deardorff v. State, 6 So.3d 1205 (Ala.Crim.App.2004), aff’d, 6 So.3d 1235 (Ala.2008); Carruth v. State, 927 So.2d 866 (Ala.Crim.App.2005); Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003), rev’d in part on other grounds, 955 So.2d 1106 (Ala.2005). Compare Yeomans v. State, 898 So.2d 878 (Ala.Crim.App.2004).

. It does not appear that the defense presented any evidence regarding this mitigating circumstance. However, because this worked to Lewis's benefit rather than his detriment, any error was harmless. See Rule 45, Ala. R.App. P.